IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 05-cv-00502-MSK-BNB

VICTORIA BALDWIN,

      Plaintiff,

v.

KEY EQUIPMENT FINANCE, INC., and
MARGARET GUTIERREZ, Individually,

      Defendants.

_____

## OPINION AND ORDER GRANTING, IN PART,
## MOTION FOR SUMMARY JUDGMENT

_____

**THIS MATTER** comes before the Court pursuant to the Defendants' Motion for

Summary Judgment **(# 17)**, the Plaintiff's response[1] **(# 29)**[2], and the Defendants' reply **(# 30)**.

## FACTS

### A.  Background

The Plaintiff, a former employee of Defendant Key Equipment Finance, Inc. ("Key"),

asserts five claims: (i) breach of implied contract, arising from Key's failure to comply with

---

[1]The Plaintiff's response was filed approximately 6 weeks late.  The Plaintiff has filed a motion for extension of time **(# 25)** to file a response, which the Defendants oppose **(# 26)**. Although the Court does not find the reasons offered in the Plaintiff's response to constitute good cause, the Defendants have not been prejudiced by the delay and have filed a reply to the response, and thus, the Court will consider the response.

[2]It appears that the Plaintiff originally filed her response at Docket # 23, and additional exhibits in support of that response at Docket # 24.  However, Docket # 29 appears to combine both prior filings, and the Court will treat that entry as the Plaintiff's actual response.

certain provisions contained in its employee handbook; (ii) promissory estoppel, arising from the same handbook provisions; (iii) a claim under Colorado's Wage Claim Act, C.R.S. § 8-4-109, for unpaid wages; (iv) a claim under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), for unpaid overtime pay; and (v) a claim of tortious interference with contract against Defendant Gutierrez.

The Defendants seek summary judgment **(# 17)** on all five claims. Specifically, the Defendants contend that: (i) with regard to the implied contract claim, the Plaintiff cannot establish the existence of a contract, in that handbook and other employment paperwork disclaimed any contractual effect and because the handbook provisions are not sufficiently specific; that she cannot the Plaintiff cannot show consideration for the alleged contract; and that the Plaintiff cannot show that the provisions were breached by Key; (ii) with regard to the promissory estoppel claim, the Plaintiff cannot show that Key should have reasonably expected her to rely on the handbook provisions; that her reliance was reasonable; or that enforcement of the handbook is necessary to prevent injustice; (iii) with regard to the Wage Claim Act claim, there are no wages owing to her; (iv) with regard to the FLSA claim, Key is entitled to judgment on its affirmative defense that the Plaintiff is exempt from the FLSA's overtime provisions because she is an administrative employee; and (v) with regard to the tortious interference with contract claim, the Plaintiff cannot show the existence of a contract with Key; Defendant Gutierrez's awareness of such a contract; interference with such a contract by Gutierrez; improper means; and any breach of the contract by Key.

### B.  Plaintiff's Hire

Most of the relevant facts are undisputed.  To the extent that they are not, the Court construes the evidence most favorably to the Plaintiff.

The Plaintiff was hired by Key in or about April 2001 as a Senior Portfolio Analyst.  Prior to beginning employment, she completed an employment application.  The top of that application states "The employment relationship at KeyCorp is ay will, which means that employment can be terminated at any time, and for any reason, at the option of either KeyCorp of the employee."  The last page of the application states, among other things, that "No promises regarding employment have been made to me and I understand that no such promise is binding upon KeyCorp unless made in writing by an officer or designated Human Resources Representative of KeyCorp.  If an employment relationship is established, I understand that I am an employee at will which means that I have the right to terminate my employment at any time, and that KeyCorp has the same right to terminate my employment at any time."  *Docket* # 18, Ex. A-1.  Notably, the copy of the application presented to the Court has the first sentence of the above-quoted language crossed-out.  However, the Plaintiff testified in her deposition that she was not the person who crossed-out the sentence.[3]

At the same time, Key provided the Plaintiff with an offer letter, reciting various terms of employment primarily relating to compensation and benefits.  The letter also stated "This letter sets out the complete terms of our offer to you and shall not be construed as a contract of

---

[3]The precise testimony on this issue was that the Plaintiff was asked if she knew who crossed the language out, and she stated that she did not.  She was then asked if she crossed the language out, and she stated "I don't know.  I don't know why I would have."  She was then asked if she remembered seeing anybody cross the language out, and she stated that she did not remember.  *Docket* # 29, Ex. 12 at 156.

employment for a fixed period of time.  KeyCorp reserves the right to terminate your employment

at any time."  *Docket* # 18, Ex. A-2.

### C.  Employment Policies

At the beginning of her employment, the Plaintiff was given a document entitled "Human

Resources Employee Guide" ("the Guide").  *Docket* # 18, Ex. A-3.  The Guide states that it "is

designed to answer many of your questions about working at KeyCorp – about its policies, pay

programs and the many benefits available to you as a KeyCorp employee."  The Guide also

contains a section entitled "Important Limitations of This Guide."  That section states, in part,

"This Guide and the policies or benefits described in this Guide do <u>not</u> create or constitute a

contract of employment, a guarantee or promise of employment or any enforceable undertaking

on the part of KeyCorp to any employee."  (Emphasis in original.)  A few pages[4] later is a section

titled "Employment At Will," which states, in part, "It is important to understand that your

employment with KeyCorp is 'at will.' . . . KeyCorp also has the same right to terminate your

employment for any reason and at any time."

Several pages later, the Guide contains a section entitled "Corrective Action," which

states "Should a performance or other work-related problem develop, KeyCorp believes in

providing employees the opportunity and assistance necessary to improve. . . Corrective action is

generally a four step process (although in certain circumstances this four step process may be

modified based on the situation)."  The four steps are a verbal warning, written warning, a final

written warning, and termination.

---

[4]It appears that only selected pages of the Guide have been included in Exhibit A-3.  The first page provided to the Court is apparently page 10 of the Guide, and various, presumably irrelevant, interstitial pages have been omitted.

The Guide also contains a section regarding Key's policies concerning paid time-off.  The first portion of the "Paid Time-Off" section of the Guide describes "Key Values" that should be considered by employees taking time off.  The next section sets forth various non-inclusive matters for which paid time-off may be used, describes the interaction between paid time-off and short-term disability, and explains how paid time-off is paid.  In a subsection titled "Unscheduled Absences," the Guide states that "In cases of an unscheduled absence, all employees are to directly notify their supervisor or other department manager of the absence and the reason for the absence before the workday begins. . . Failure to notify the manager by the beginning of the work time may result in an unexcused and unpaid absence.  In addition, excessive unscheduled absences and tardiness constitute grounds for corrective action up to an including termination," and goes on to further explain the consequences of unscheduled absences.

The Plaintiff cites to several additional manifestations of employment policies.  Exhibit 5 to her response is a five-page document entitled "Key Equipment Finance Time and Attendance Policy."  *Docket* # 29, Ex. 5.[5]  The document elaborates on the paid time-off policy described in the Guide.  It states that "Managers are responsible for determining whether unscheduled absences are excessive and corrective action is warranted."  It provides that more than five unscheduled absences are instances of tardiness "is generally considered excessive" and provides "guidelines" for the discipline to be administered, based on the number of instances of absence or tardiness.  The source of this document is not clear, but the Court assumes that it was disseminated to the Plaintiff by Key as an explanation of policies that would apply to her.

---

[5]Exhibit 6 to the Plaintiff's response appears to be the same policy, except in a larger font.

Exhibit 7 to the Plaintiff's response is a document entitled "Professional Conduct." *Docket* # 29, Ex. 7. The document states that "conduct which brings discredit to KeyCorp . . . or is otherwise unprofessional, will not be tolerated. Such activity is prohibited and may result in accelerated corrective action or immediate termination without further warning or recourse to the disciplinary procedures discussed under corrective action." The document then states that "[c]onduct which is unprofessional includes, but is not limited to the following," and goes on to list numerous types of misconduct. The document ends with a statement that "This list of unprofessional conduct is not intended to be all inclusive. KeyCorp reserves the right to determine whether other conduct not listed above may warrant accelerated corrective action or immediate termination." As with the Time and Attendance Policy document, the source of the Professional Conduct document is not clear, but the Court assumes it reflects a policy by Key that applies to the Plaintiff.

### D.  Discipline Administered to Plaintiff

Beginning in 2004, the Plaintiff was issued a series of disciplinary notices concerning her job performance. On June 29, 2004, Defendant Gutierrez issued a verbal warning and "Corrective Action Form" to the Plaintiff, citing various work errors, excessive personal phone calls, disruptive behavior, and misuse of the internet. The Plaintiff does not dispute that the warning and Action Form were issued, nor that their contents are accurate, but contends that "[t]he write-up is untimely, and is given three months after the fact." *Docket* # 29 at 4. The Plaintiff also contends that some of the matters cited are not "violations worthy of discipline under the company policies," apparently insofar as matters such as excessive internet use and personal

6

phone calls are not specifically itemized as prohibited in the "Professional Conduct" document. *Id.*

On February 10, 2005, Defendant Gutierrez issued a "Written Corrective Action Plan" to the Plaintiff, citing problems with accuracy, poor communication, at least six unscheduled absences, tardiness, and various other matters. *Docket* # 18, Ex. A-4. The document directed the Plaintiff to prepare, by February 14, 2005, a plan addressing how her performance would improve. The Plaintiff apparently noted on each page of the document that "I completely disagree with the contents of this document." In her response to the motion for summary judgment, the Plaintiff does not elaborate on her disagreement with the document's contents, stating only that the document was "not timely, and in violation of company procedures," apparently because the Guide's description of the Corrective Action policy does not mention anything called a "written corrective action plan." *Docket* # 29 at 4. The Plaintiff does assert that the document "incorrectly accuses her of unexcused absences which were in fact excused," but cites to no evidentiary material in the record in support of this contention.

Although the Plaintiff and Defendant Gutierrez had arranged to meet on February 11, 2005 to discuss the Plaintiff's status, the Plaintiff called in sick that day. Defendant Gutierrez called the Plaintiff back and requested that the Plaintiff bring a doctor's note. On the following workday, February 14, 2005, the Plaintiff left a message for Gutierrez that she was taking a "personal time off day." The Plaintiff returned to work on February 15, 2005, and Defendant Gutierrez issued the Plaintiff a final written warning. That warning was primarily based on the fact that the manner in which the Plaintiff called in her absences on February 11 and 14, 2005 was inconsistent with the requirements imposed by Defendant Gutierrez in the February 10, 2005

warning.[6]  The warning advised the Plaintiff that "failure to demonstrate and sustain improvement in your performance will result in termination."  *Docket* # 18, Ex. A-18.  As with the prior warning, the Plaintiff wrote on the final warning that "I completely disagree with the contents of this document."  In her response to the summary judgment motion, she does not specifically cite to any portion of the document that is incorrect, but does assert that her absences on February 11 and 14, 2005 were permissible under Key's attendance policies.

On February 15, 2005, the Plaintiff met with Defendant Gutierrez and Human Resources Manager Marsha Faulconer.  At that meeting, the Plaintiff refused to draft the corrective plan and status reports required by the February 10, 2005 warning, on the grounds that the Plaintiff disagreed with that warning.  They also discussed an incident that had occurred on February 9, 2005 (but which had occurred after Defendant Gutierrez had drafted the February 10, 2005 warning memo).   The incident involved the Plaintiff's distribution of a report without first obtaining Defendant Gutierrez's approval.  The Plaintiff's summary judgment response does not dispute the Defendants' characterization of this meeting.

On February 17, 2005, Defendant Gutierrez issued a notice terminating the Plaintiff's employment.  The termination notice recites some of the previous matters, and also describes an event in which the Plaintiff failed to timely and adequately prepare a presentation on February 16, 2005.  Again, the Plaintiff wrote that she disagreed with the contents of the document, but in her summary judgment response, she states only that there were "no new issues of any significance to justify termination."  *Docket* # 29 at 5.

---

[6]The warning required the Plaintiff to speak directly with Defendant Gutierrez if the Plaintiff was going to be absent from work.

After the Plaintiff's termination, Key issued her final paycheck, less deductions for certain paid time off days that were advanced to the Plaintiff and a salary advance the Plaintiff had received.  In October 2005, during discovery in this case, Key observed that it still owed the Plaintiff four hours worth of wages.  Key tendered the Plaintiff a check for these wages, plus an additional 50% of the unpaid wages as a penalty under the Wage Claim Act.  The Defendants therefore contend that there are no wages or penalties due to the Plaintiff.  The Plaintiff contends that, under C.R.S. § 8-4-109(3), she is entitled to a penalty amounting to the <u>greater</u> of 50% of the wages due or 10 days' pay, and that the failure of Key to remit this later, larger amount, permits the Wage Claim Act claim to continue.

**ANALYSIS**

**A.  Standard of review**

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Substantive law determines what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary

9

judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(e). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is no genuine dispute as to any material fact, no trial is required because the court applies the law to the undisputed facts and enters judgment. If there is a genuine dispute as to material fact, a trial is required.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the non-movant comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the non-movant fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

**B.  Breach of Contract and Promissory Estoppel Claims**

Colorado law recognizes that, in certain circumstances, an employee can maintain an action for breach of contract based on the employer's failure to comply with procedures established in an employee handbook. *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 711-12 (Colo. 1987). *Keenan* contemplated two different means by which promises in an employee

handbook or manual could become enforceable: (i) under ordinary contract principles – that is,

where "in promulgating the termination procedures the employer . . . manifested his willingness to

enter into a bargain in such a way as to justify the employee in understanding that his assent . . .

would conclude the bargain and . . . his initial or continued employment constituted acceptance of

an consideration for those procedures," *id.* at 711; and (ii) where the requisites of contract

formation are not found, under a theory of promissory estoppel, if the employee "can demonstrate

that the employer should reasonably have expected the employee to consider the employee

manual as a commitment from the employer to follow the termination procedures, that the

employee reasonably relied on the termination procedures to his detriment, and that injustice can

be avoided only be enforcement of the termination procedures." *Id.* at 712.  However, *Keenan*

noted that employment in Colorado is presumed to be at-will, and that the burden of proof is on

the employee to rebut that presumption.  *Id.*; *Wisehart v. Meganck*, 66 P.3d 124, 127 (Colo. App.

2002).

　　To proceed under either theory, the employee must make two threshold showings: (i) that

the policy sought to be enforced is a "promise"; and (ii) that its terms are sufficiently definite to

allow the Court to understand and apply it.  *Soderlun v. Public Service Co. of Colorado*, 944

P.2d 616, 620-21 (Colo. App. 1997).  To be sufficiently promissory, a company policy must

reflect a commitment by the employer to behave in a certain way; mere expressions of corporate

goals or values are insufficient.  *Id.* at 620.   One way in which promissory intent is shown <u>not</u> to

exist is where the employer's policy manual contains a conspicuous disclaimer of any contractual

effect.  *Jaynes v. Centura Health Corp.*, ___ P.3d ___, 2006 WL 1171858 (Colo. App. May 4,

2006).  Whether a disclaimer is sufficiently clear and conspicuous is a question of law for the

Court.  *Id.*, *citing Durtsche v. Am. Colloid Co.*, 958 F.2d 1007 (10th Cir.1992).

The policies cited by the Plaintiff are not promissory for several reasons.  First, none of

them have language that can be said to reflect a commitment by Key to bind itself to act in a

certain way.  The Corrective Action section of the Guide states that the corrective action policy is

"generally" a four-step process, and "may be modified based on the situation."  Statements of

how an employer "generally" acts do not constitute promises, particularly where the policy

advises employees that the general rule is subject to modification in unspecified "situation[s]."

*Jaynes, supra.* at *10 ("The terms 'guidelines' and 'normally' are consistent with discretionary

rather than mandatory termination procedures").  Likewise the attendance policy, which speaks

of general rules and "guidelines" for supervisors does not reflect any promise by Key to behave in

a certain way.  *Id.*   That policy also reserves to supervisors the authority to determine what

corrective action to apply to unscheduled absences, based upon the supervisor's consideration of

several factors.  The Plaintiff's argument that the Professional Conduct document somehow

constitutes a limitation on the types of behavior for which Key may discipline employees is

frivolous.  That document expressly states that its list of prohibited behavior is "not intended to be

all inclusive," and that "other conduct" may also result in discipline.

The qualified language used in Key's policies is a far cry from the types of absolute

promises that have been found to be enforceable in other cases.  *See e.g. Adams County School*

*Dist. v. Dickey*, 791 P.2d 688, 690 ("The handbook states that a supervisor may <u>only</u> discharge a

classified employee if the employee's work is of such quality to require discharge, and that in

discharging employees supervisors <u>must</u> follow a policy of progressive discipline. The handbook

also states that the School District may <u>only</u> resort to immediate dismissal of an employee for certain enumerated acts of misconduct") (emphasis added).  It appears that the Plaintiff's arguments as to the promissory nature of the policies are not based on what the policies say, but on what the Plaintiff wished they said.  For example, the Plaintiff argues that the "Professional Conduct" document "sets forth the standard that termination from the company as a result of actions by an employee will be only for just cause." *Docket # 29 at 11.*  How the Plaintiff reads the document for this proposition is a mystery, as the document makes no use whatsoever of the words "just cause" or "only," and is clear in its reservation of Key's right to consider whether conduct it deems unprofessional warrants accelerated discipline or immediate termination. Likewise, the Plaintiff appears to read some temporal limitation into the policy, prohibiting discipline from being administered for "untimely" acts.  No such limitation is present in the record.

Even assuming the Plaintiff could cite to some policy language reflecting a promissory intent, Key has clearly and conspicuously disclaimed any intent to enter into a contract with the Plaintiff.[7]  Putting aside disclaimers in the job application and offer letter, the Court notes that the Guide itself, in which the Corrective Action policy appears, contains a clear disclaimer of any contractual effect, set off in a separate paragraph near the beginning of the document and followed closely by another separate section emphasizing the at-will nature of the Plaintiff's employment.  *See e.g. Jones v. Denver Public Schools,* 427 F.3d 1315, 1324 (10th Cir. 2005)

_____

[7]The Plaintiff contends that reliance upon a disclaimer is an affirmative defense for which the Defendants bear the burden of proving the disclaimer is effective. *Docket # 29 at 8, citing Ferrera v. A.C. Nielsen Co.,* 799 P.2d 458, 461 (Colo. App. 1990) *and Therrien v. United Air Lines, Inc.,* 670 F.Supp. 1517 (D.Colo.1987).  Neither cited case stands for that proposition.  In any event, it is unnecessary to decide which party has the burden regarding the disclaimer because all of the relevant facts as to the content and placement of the disclaimer are effectively undisputed, and the Court can resolve the issue as a matter of law.

13

("Although Colorado courts do not consider a disclaimer 'clear and conspicuous' if it is 'inconspicuously placed in an appendix to the handbook,' they have found disclaimers clear and conspicuous when they appear on the first page of the handbook, or 'in close proximity to the provision setting forth ... required procedure on termination'") (citations omitted).  Despite the Plaintiff's characterization of the disclaimer's placement on page 10 of the Guide as being "[b]uried in the handbook," *Docket* # 29 at 10, it sits in a prominent place in the beginning of the text,[8] as well as in relatively close proximity to the Corrective Action policy the Plaintiff relies upon, which, to use the Plaintiff's term, is itself "buried" 11 pages deeper in a document that appears to be some 80 pages long.  *See Docket* # 29, Ex. 4 (table of contents for the Guide).

The Plaintiff argues that the absence of a disclaimer on the Professional Conduct document and the Time and Attendance Policy nullifies any effectiveness of the disclaimer contained in the Guide.  *Docket* # 29 at 9-10, *citing Burrill v. GTE Govt. Sys. Corp.*, 804 F.Supp. 1356, 1360-61 (D. Colo. 1992) *and Cronk v. Intermountain Rural Elec. Coop.*, 765 P.2d 619, 234 (Colo. App. 1988).  In *Burrill,* a disclaimer was found only on the plaintiff's employment application, not in the subsequently-provided employee handbook that required just cause to support discharge.  804 F.Supp. at 1360.  In *Cronk*, a disclaimer was added to the employee manual after the plaintiff had already begun employment.  765 P.2d at 623.  Neither case clearly stands for the proposition urged by the Plaintiff – that an otherwise effective disclaimer in an

---

[8] The table of contents of the Guide indicates that the text of that document starts at page 7 with a "Vision Statement," followed by a two-page Glossary, then the disclaimer.  It is hard to imagine the disclaimer being any more conspicuously placed in the Guide.

14

employee handbook is nullified by the issuance of policy statements elsewhere that do not contain a disclaimer.[9]

Finally, the Plaintiff argues that Defendant Gutierrez testified "that the policies of the company could be relied upon by the employees, and the company stood behind those policies." *Docket* # 29 at 3, *citing* Ex. 13 at p. 62-64, 74. This, too, appears to be a wishful misreading of Defendant Gutierrez's actual testimony. The cited testimony involves the Plaintiff's counsel examining Defendant Gutierrez with regard to an unidentified[10] document that contains a section entitled "Introduction to the Guide," has three bullet points at the top, and sets forth how "the DHP process and performance goals and results [are] going to be handled." None of the corporate policy documents in the record match this description. Defendant Gutierrez identifies the document in question as "one of the guides that speaks to how we will differentiate for (sic) higher performance and . . . how the performance metrics are established and how you'll be measured." From this colloquy, it would appear that Defendant Gutierrez is discussing a

---

[9]At best, one might infer such a rule from *Cronk*. There, the disclaimer added to the handbook was insufficient to rebut contractual promises found elsewhere in the handbook. However, the peculiar timing of *Cronk* would limit the application of such a rule here. Unlike the employee in *Cronk*, the Plaintiff here was fully apprised of the disclaimer at the time she received – and allegedly relied upon – the Guide, and would be expected to assume that the disclaimer applied when she consulted any other corporate policies. *Compare e.g. Giannola v. Aspen/Pitkin Housing Auth.*, 165 Fed.Appx. 661, 665-66 (10th Cir. 2006) (unpublished) (employee's receipt of personnel manual with disclaimer of contractual relationship occurred <u>after</u> employee had entered into contractual relationship, and thus, employee could reasonably assume disclaimer did not apply to her).

[10]The Plaintiff has attached the entirety of both her own and Defendant Gutierrez's depositions to her brief. However, the Court has only examined those pages of the depositions that have been specifically cited by the parties in their briefs. The Court will not *sua sponte* search for evidence in deposition transcripts to support the parties' arguments. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671-72 (10th Cir. 1998).

document "on how performance reviews would be taking place and what you would be measured on," not the Guide, the Professional Conduct document, the Time and Attendance policy, or any other document at issue in this case.  Thus, when Defendant Gutierrez answers affirmatively the question "And should an employee assume that, in fact, that's what the company will do?," that answer does not constitute an assertion that Key expected employees to rely upon the policies cited by the Plaintiff herein.[11]  In any event, because the Court has determined that none of the policies cited by the Plaintiff amount to promises of specific treatment, whether Key intended employees to rely on the policies or not is irrelevant.

Accordingly, the Plaintiff has not established a prima facie claim for breach of contract or promissory estoppel.  Moreover, the undisputed facts show that the policies in question are not promissory in nature, a necessary element for both claims.[12]  *Jaynes*, *supra.*

_____

[11]Even assuming the parties are discussing the Guide, Defendant Gutierrez's testimony was much more equivocal than the Plaintiff acknowledges.  When asked "And is it fair for the employee to assume that the company will follow these practices set forth in this manual?," Defendant Gutierrez answered "It's not reasonable to use this guide in isolation without the other policies," and that in circumstances where representations in the document were internally inconsistent, Defendant Gutierrez would suggest that the employee contact Human Resources in an attempt to resolve the conflict.

[12] Were the Court to reach the other elements of these claims, which is not necessary, it would find that 1) as a matter of law, the policies are not sufficiently specific to permit enforcement, as the policies speak only in generalities and reserve discretion to Key as to when the policies may be applied in an accelerated manner or disregarded altogether; and that  2) the Plaintiff has not made a prima facie showing that the Defendant violated the policies.  The Plaintiff received verbal, written, and final written warnings, prior to termination, just as the Corrective Action policy provides.  Each warning advised the Plaintiff of the defects in her performance, and instructed her as to how her behavior must change.  The Plaintiff's complaint that the warnings were "untimely" is not grounded in any term of the policy limiting when discipline must be imposed, and her complaints that she was not given sufficient time to remedy her performance is belied by undisputed evidence that she either refused to comply with Defendant Gutierrez's instructions (*e.g.* that the Plaintiff to draft an improvement plan; that the Plaintiff speak personally to Defendant Gutierrez if she was going to be absent), or continued to experience new

### C. Wage Claim Act

The Colorado Wage Claim Act requires that, at the termination of employment, all wages earned, vested, and determinable be paid to the employee immediately.  C.R.S. § 8-4-109(1)(a). If the employer fails or refuses to make the payment, the employee may make a demand for payment within 60 days of termination.  C.R.S. § 8-4-109(3).  If the employer does not make the required payment within 10 days of the demand, the employer is responsible to pay both the owed wages and a penalty.  *Id.*  The penalty is the <u>greater</u> of either: (i) 50% of the wages owed, or (ii) the value of 10 days' pay at the employee's average daily wage.  *Id.*   However, the penalty does not accrue unless and until the employee makes a timely demand for payment.  Key contends that the Plaintiff has the burden of proof on this claim, whereas the Plaintiff argues that Key bears the burden of proving that it has fully complied.

The parties do not dispute that Key failed to pay certain wages owed to the Plaintiff at the time of her termination.  The parties also do not dispute that Key eventually paid the outstanding wages, plus the 50% penalty, during the pendency of this litigation.  The Plaintiff maintains that the 10 days' pay penalty is greater than the 50% penalty, and that she is therefore entitled to that amount.  Key responds that the Plaintiff demanded the 50% penalty in her February 22, 2005 demand letter, and that she should be equitably estopped from seeking the 10 days' pay penalty now.

---

performance problems after the counseling.   The discipline administered to the Plaintiff for her absences from work was in conformance with the substantial discretion afforded Defendant Gutierrez by the Time and Attendance policy.  *See e.g. Docket* # 29, Ex. 5 at 3 ("Managers are responsible for determining whether unscheduled absences are excessive and corrective action is warranted. . . To determine the extent of the corrective action [several factors are relevant].  If excessive unscheduled days are being used for illness, medical verification may be requested at the manager's discretion. . . In addition, the manager can accelerate the corrective action process.")

The doctrine of equitable estoppel exists to prevent a party from taking a legal position inconsistent with an earlier statement or action that places his adversary at a disadvantage. *Kowalczyk v. I.N.S.*, 245 F.3d 1143, 1149 (10th Cir. 2001). To show that estoppel applies, the party asserting it, here the Defendant, must show that (i) the party to be estopped knew the facts; (ii) the party intended that his conduct would be acted upon or acted in such a way that the party asserting estoppel reasonably believed that it was so intended; (iii) the party asserting estoppel was ignorant of the true facts; and (iv) the party asserting estoppel relied upon the other party's conduct to his injury. *Id.*

The Plaintiff's February 22, 2005 demand letter to Key read as follows:

> Pursuant to C.R.s. § 8-4-109 we hereby make a written demand for the payment of Ms. Baldwin's unpaid wages and vacation time due to her. Colorado law requires that this payment should have been made at the time of her discharge and was due and payable immediately. If her earned wages and other compensation are not forwarded to my office within ten days after your receipt of this demand your company may be held liable for a 50% penalty of the amount of the wages in addition to the unpaid wages and other damages under Colorado statute.

*Docket* # 30, Ex. A-24. Key has not pointed to any other evidence supporting its claim that the Plaintiff should be equitably estopped from seeking the 10 days' pay penalty.

The Court finds that Key has not made a prima facie showing of the elements of equitable estoppel, particularly the second, third, and fourth elements. The letter does not clearly indicate that the Plaintiff was manifesting an intention to waive the 10 days' pay penalty in favor of he 50% penalty if Key paid the wages, nor could Key reasonably infer from the letter that the Plaintiff was offering the waive the 10 days' pay penalty. The Plaintiff's reference to the 50% penalty is merely a (partial) explanation of the statute's consequences for failure to pay wages, not

18

an offer to surrender some portion of the available penalties.  Moreover, Key cannot claim that the operative facts were not known to it.  The possibility of the statutory 10 days' pay penalty was not concealed from Key by the Plaintiff; indeed, the Plaintiff's letter cited to the precise statutory section containing the penalty.  Finally, Key has not submitted evidence establishing that it relied to its detriment on the Plaintiff's letter, as it did not make payment of the wages until some eight months later, or that it has been subjected to any detriment by the Plaintiff's conduct. Key's payment of the 50% penalty would be offset by an equal amount of the 10 days' pay penalty that it has already paid.[13]

Accordingly, Key is not entitled to summary judgment on this claim.  It has  failed to submit sufficient evidence to prevail on it's affirmative defense, and therefore such defense is dismissed.

The ultimate burden of calculating the amount of penalty due is on the Plaintiff, and the record is insufficient to establish what amount is claimed or the extent to which Key disputes that amount.  There is no challenge made by Key as to the Plaintiff's ability to present a prima facie claim on the merits.  Thus, although a trial on the issue of damages is  required, it is unclear whether there are actually facts in dispute - indeed, it may be only an arithmetic dispute remaining

---

[13]To the extent Key complains that it is subjected to a claim by the Plaintiff for attorney's fees under C.R.S. § 8-4-110, it is not clear that Key's conduct in paying the wages during the course of this litigation would have allowed it to avoid exposure to a fee award by paying the wages and 50% penalty in October 2005.  To the extent Key complains that it is exposed to a fee claim for fees expended after it tendered payment in October 2005, the Court merely reminds the parties that the statute authorizes "reasonable attorney fees."  Given what appears to be a relatively small amount in dispute, it would appear that a reasonable attorney fee expended to collect that amount would itself be relatively small.  The Court is confident that, in light of this ruling, the parties can reach an agreement as to both the amount of the penalty still owed and a reasonable attorney fee relating to this claim.

- the amount actually owed to the Plaintiff on the 10 days' pay penalty offset by Key's prior payment of the 50% penalty.[14]

**D.  FLSA Claim**

The Plaintiff contends that, under the FLSA, she is entitled to overtime pay for any week in which she worked more than 40 hours.  29 U.S.C. § 207(a)(1).  Key contends that the Plaintiff is excluded from the coverage of the FLSA as an administrative employee.  29 U.S.C. § 213(a)(1).

Section 213(a)(1) of the FLSA exempts from the Act's overtime requirements "any employee employed in a bona fide executive, administrative, or professional capacity." The FLSA itself does not define "administrative."  Rather, the Department of Labor has issued regulations interpreting that term.  The regulations look beyond the job title to the actual tasks performed by the employee.  29 C.F.R. § 541.2.  To be an exempt administrative employee, an individual must: (i) be compensated on a salary basis earning not less than $455 per week; (ii) have primary duties involving the performance of office or non-manual work directly related to the management or general business operations of the employer; and (iii) have primary duties that include the exercise of discretion and independent judgment with regard to matters of significance.  29 C.F.R. § 541.200(a).

The second element – performing management or business operations – examines whether the employee performs work directly related to assisting with the running or servicing of the business, as distinguished from manufacturing or selling a product.  29 C.F.R. § 541.201(a).  The

---

[14]The parties are reminded of their obligations under Fed.R.Civ.P 11 not to contest factual or legal contentions for which they have no contrary evidence or a good faith argument as to the applicability of the law.

regulations give examples of typical administrative duties: accounting, budgeting, auditing, quality control, purchasing, procurement, advertising, human resources, labor relations, computer network administration, and legal and regulatory compliance. 29 C.F.R. § 541.201(b).

The third element – examining whether the employee exercises discretion and independent judgment – examines whether the employee evaluates possible courses of conduct, and acts or makes decisions on important matters after various possibilities have been considered. 29 C.F.R. § 541.202(a). Whether an employee exercises independent judgment is a fact-intensive inquiry, examining factors such as whether the employee has the authority to formulate, affect, interpret, or implement policies; whether the employee carries out major work affecting the operations of the business or business operations in a particular segment; whether the employee can commit the employer in matters having significant financial impact; whether the employee can waive or deviate from established policies without prior approval; and whether the employee is involved in short-term or long-term planning of business objectives. 29 C.F.R. § 541.202(b). The essence of independence is whether the employee has authority to make choices free from immediate direction or supervision, even if the employee's actions amount to only recommendations that may be rejected by superiors. 29 C.F.R. § 541.202(c). However, the employee must do more than simply use skill in applying well-established techniques, procedures, or standards devised by the business. 29 C.F.R. § 541.202(e). For example, an employee who engages in clerical work or the accumulation and tabulation of data is not engaged in the exercise of independent judgment. *Id.* The regulations give examples of exempt administrative employees, including "employees in the financial services industry":

> Employees in the financial services industry generally meet the duties requirements for the administrative exemption if their duties include work such as collecting and analyzing information regarding the customer's income, assets, investments or debts; determining which financial products best meet the customer's needs and financial circumstances; advising the customer regarding the advantages and disadvantages of different financial products; and marketing, servicing or promoting the employer's financial products. However, an employee whose primary duty is selling financial products does not qualify for the administrative exemption.

29 C.F.R. § 541.203(b).

The employer bears the burden of proving that an employee falls within an exemption to the FLSA. *Corning Glass Works v. Brennan,* 417 U.S. 188, 196-97 (1974); *Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1203 (10th Cir. 2004). Because exemptions under the FLSA must be narrowly construed, the employer must show that the Plaintiff "plainly and unmistakably" falls within the exemption's terms. *Rodriguez v. Whiting Farms, Inc.*, 360 F.3d 1180, 1184 (10th Cir. 2004). Whether the employer has established the applicability of an exemption is a question of law for the Court. *Cleveland v. City of Los Angeles,* 420 F.3d 981, 988 (9th Cir. 2005); *Singer v. City of Waco,* 324 F.3d 813, 818 (5th Cir. 2003); *Ale v. Tennessee Valley Authority,* 269 F.3d 680, 691 (6th Cir. 2001). However, where there are disputes as to what work the employee performed or the circumstances in which the work was performed, those are factual disputes amenable to resolution by a jury. *Singer, id.*

The parties do not generally dispute <u>what</u> tasks the Plaintiff performed, but differ as to the <u>significance</u> of those tasks. The Court has carefully considered the parties arguments and evidence, and concludes that some of the Plaintiff's tasks – developing policies relating to compliance with federal laws and creation of the CT Vision System – appear on the surface to be

administrative duties involving independent judgment, while other tasks – the generation of

reports without independent analysis by the Plaintiff – do not.  Faced with a mix of exempt and

clearly non-exempt work, the Court must turn to whether exempt tasks comprise the Plaintiff's

"primary duties." 29 C.F.R. § 541.200(a).  Determining an employee's "primary duties" is a fact-

intensive inquiry with "the major emphasis on the character of the employee's job as a whole."  29

C.F.R. § 541.700(a).  The Court must consider "the relative importance of the exempt duties as

compared with other types of duties" and "the amount of time spent performing exempt work,"

among other things.  *Id.*  Whether the employee spends more than 50% of her time on exempt

tasks is one indication that such tasks are her "primary duties," but time alone is not the sole test,

and other facts can indicate that an employee who spends less than 50% of her time on exempt

tasks is nevertheless exempt.  29 C.F.R. § 541.700(b).

　　　The present record does not permit the Court to make the "primary duties" analysis, as the

parties have chosen to focus with pinpoint precision on certain tasks, without providing the Court

with a general understanding of the Plaintiff's various duties and their significance in the operation

of Key's business.  For example, there is much discussion of the Plaintiff generating "reports," but

the particular means by which the Plaintiff generates these reports, the time it takes to do so, and

the importance of these reports to the overall functioning of Key remain a mystery.  There is some

discussion of the Plaintiff creating the CT Vision Systems database, but what that database

records, and the importance of that information to Key's business is not apparent.  Key's motion

does not cite to any evidence indicating the relative amounts of time spent by the Plaintiff on

various tasks, making it impossible to determine how much of her work time is devoted to exempt

duties.  Because the Court is unable to adequately analyze whether exempt tasks constitute the

Plaintiff's "primary duties," it finds that  Key has failed to carry its burden of proving that the

Plaintiff "plainly and unmistakably" falls within the administrative exemption, and its request for

summary judgment on the FLSA claim is denied.

### E.  Interference with contract claim

Finally, Defendant Gutierrez seeks summary judgment on the Plaintiff's claim of

intentional interference with contractual relations.  To establish such a claim, the Plaintiff must

show that Defendant Gutierrez: (I) intentionally and (ii) improperly (iii) interfered with the

performance of a contract between the Plaintiff and Key (iv) by inducing or otherwise causing

Key not to perform the contract.[15]  *Memorial Gardens, Inc. v. Olympian Sales & Management*

*Consultants, Inc.*, 690 P.2d 207, 210 (Colo. 1984).

The Plaintiff correctly points out that even contracts terminable at will are subject to the

tort, *Jandro v. Foster*, 53 F.Supp.2d 1088, 1099 (D. Colo. 1999), but such at-will contracts are

afforded lesser protection, as interference with an at-will contract deprives the parties of future

expectations, not vested legal rights.  *Memorial Gardens,* 690 P.2d at 211.  As discussed above,

the various policies cited by the Plaintiff did not create any independent contractual rights in the

Plaintiff, and thus, her employment was always terminable "at will" by either Key or the Plaintiff.

Even if Defendant Gutierrez induced Key to terminate the Plaintiff's at-will employment, such a

termination was fully within Key's rights, and cannot constitute a breach of the at-will contract

sufficient to support a claim by the Plaintiff.[16]  *Electrolux Corp. v. Lawson*, 654 P.2d 340, 341

---

[15]Injury sustained by the Plaintiff as a result of the interference is an additional element of
the claim, but is not at issue here.

[16]Such a claim might lie, notwithstanding the Plaintiff's at-will employment, if Defendant
Gutierrez induced Key to take some action that would breach of even an at-will contract.  For

(Colo. App. 1982) ("Here, the employment contracts with Electrolux were terminable at will. Thus, the employee resignations did not constitute a breach of their employment contracts").

Moreover, the Plaintiff has not shown that Defendant Gutierrez's conduct, even if taken in the light most favorable to the Plaintiff, was improper. Although *Trimble vs. City and County of Denver*, 697 P.2d 716, 726 (Colo. 1985) can be read for the proposition that a supervisory employee can be liable for improperly interfering with a contract between a subordinate and the employer, the status of the supervisor as an agent of the employer is an important factor in determining whether the supervisor's actions are improper. *Id.* In determining whether one has acted "improperly" for purposes of this claim, the Court examines several factors, including the nature of the conduct, the actor's motive, the interests sought to be advanced by the actor, and the social interests involved. *Id.* at 726, *citing Memorial Gardens*, 690 P.2d at 210 *and Restatement* (Second), Torts § 766. These factors unambiguously indicate that Defendant Gutierrez's conduct was not improper.

The Plaintiff's only complaints about Defendant Gutierrez's actions are that the types of conduct Defendant Gutierrez disciplined her for were not actually contrary to company policies, and that Defendant Gutierrez did not punish others for similar behavior. As discussed above, the argument that Defendant Gutierrez's conduct contravened company policies in disciplining the Plaintiff for, say, improper use of the internet, excessive personal calls, or doodling during meetings relies on wishful and strained readings of the policies in question. The argument that the pace of the various warnings to the Plaintiff in her final days also reads terms into Key's policies

---

example, if Defendant Gutierrez falsified the Plaintiff's time card, inducing Key to refuse to pay the Plaintiff for work she had already performed, such an inducement would cause Key to breach its contract with the Plaintiff in a way that Key was not free to do at will.

that are not expressly stated.  The Court cannot say that Defendant Gutierrez's conduct was improper in any way, much less that it was so improper as to create liability in tort.  Similarly, the Plaintiff has failed to adduce any evidence that Defendant Gutierrez harbored any improper motive.  Undoubtedly, the relationship between the Plaintiff and Defendant Gutierrez soured beyond repair, but at the same time, the Plaintiff does not dispute the various facts underlying the various disciplinary notices issued by Defendant Gutierrez.  Although the Plaintiff may believe that her transgressions were of minor consequence, she has not shown any evidence that would suggest that Defendant Gutierrez similarly believed them to be minor, and maliciously imposed discipline she knew to be unwarranted.  By contrast, the record suggests that Defendant Gutierrez believed that she was acting according to Key's policies, and Key has never disclaimed that Defendant Gutierrez's conduct was done in its name and with its approval.

Finally, the Court has grave concerns about the social ramifications of holding a supervisor personally liable in tort for imposing discipline on an employee.  Allowing an employee to sue her supervisor for issuing discipline that resulted in termination would effectively swallow the notion of at-will employment.  Circumstances in which an employee will disagree with the propriety or extent of discipline imposed upon her are ubiquitous, and forcing the supervisor (or, more likely, the employer indemnifying him or her) to prove that each disciplinary notice was warranted in order to avoid liability for interfering with the employment relationship would be the equivalent of a rule requiring all discipline to be supported by just cause.  The Colorado courts have steadfastly refused to require just cause to support discipline and discharge, and this Court is reluctant to permit such a claim to lie in the absence of evidence of an extraordinary abuse of supervisory power.  No such evidence exists here.

26

Accordingly, the Court finds that the Plaintiff has failed to carry her burden of adducing evidence that would establish that Defendant Gutierrez improperly interfered with the Plaintiff's employment relationship with Key. Defendant Gutierrez is entitled to summary judgment on the claim against her.

<u>CONCLUSION</u>

For the foregoing reasons, the Defendants' Motion for Summary Judgment (**# 17**) is **GRANTED IN PART**, insofar as Defendant Key is entitled to judgment on the Plaintiff's claims for breach of contract, promissory estoppel, and Defendant Gutierrez is entitled to judgment on the Plaintiff's claim of intentional interference with contract, and **DENIED IN PART**, insofar as the Defendants are not entitled to judgment at this time on the Plaintiff's Wage Claim Act and FLSA claims. Trial will be limited to these two claims. There being no remaining claims asserted against Defendant Gutierrez, the caption of the case shall be amended to omit her. The Plaintiff's Motion for Extension of Time (**# 25**) is **GRANTED**.

Dated this 17th day of July, 2006

**BY THE COURT:**

Marcia S. Krieger
United States District Judge

27